**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

     **v.**                              **1:05-CR-427**
                                                **(GLS)**

**FARDIN SHARIFIPOUR,[1]**

                     **Defendant.**

**APPEARANCES:**               **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY      JAMES C. WOODS
United States Attorney            Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

HON. ALEX BUNIN              PAUL J. EVANGELISTA
Federal Public Defender        Assistant Federal Defender
39 North Pearl Street, 5th Floor
Albany, New York 12207

**Gary L. Sharpe**
**U.S. District Judge**

---

     [1]The correct spelling of the defendant's name appears to be
"Sharifipour."

**Amended Decision and Order**

## I. Introduction

Fardin Sharifipour has been indicted for cashing stolen checks, *see* 18 U.S.C. §§ 1708 and 2, and now moves to suppress three statements he made to police officers, and to strike surplusage from the indictment.[2]  *See Dkt. No. 16 ("Sharifipour Mot.")*; *see also* FED. R. CRIM. P. 12(b)(3)(C) & 7(d).  For the reasons that follow, his motion is denied in its entirety.

## II. Facts

The essential facts are based on the court's evaluation of the following:  the applicable burden of production and proof; the testimony of Rotterdam Police Detective Donald Scavia, Postal Inspector Raymond J. Smith, Secret Service Agent Jon Lombardoni, the Manager of Topps Diner, Maria A. Espisito, and the defendant's wife, Sosan Sharifipour; Fardin Sharifipour's Declaration; the suppression hearing exhibits; the parties'

---

[2]Sharifipour also sought suppression of a fourth statement made on January 8, 2004, *see Sharifipour* Mot. at 1, but the government withdrew its notice of intention to offer the statement in its direct case.  *See Gov't MOL* at 1 n. 1, *Dkt. No. 18*; *see also* FED. R. CR. P. 12(b)(4); *United States v. Elliott*, 363 F. Supp. 2d 439, 443 (N.D.N.Y. 2005).

submissions; and the resolution of credibility issues.  *See* FED. R. CRIM. P. 12(d); *see also United States v. Miller*, 382 F. Supp. 2d 350, 361-363 (N.D.N.Y. 2005) (burden of production and proof).

Thirty-four years old, Sharifipour was born in Afghanistan, his native language is Farsi, and he spoke no English when he entered the United States in 1984.  Over the next twenty years, he worked as a dishwasher and cook.  Since 1993, he committed crimes in his spare time as is reflected by his criminal record which follows:  (1) a 1993 theft conviction; (2) a 1995 theft conviction; (3) an August 21, 2000, arrest for, *inter alia*, possession of a forged instrument committed on May 23, 2000; (4) a December 13, 2000, arrest for, *inter alia*, five separate charges of possessing forged instruments on November 9, 15, 21, 22, and 27, 2000; and (5) a January 8, 2004, arrest for, *inter alia*, possession of a forged instrument committed on January 6, 2003.[3]  Apparently, most of the 2000 arrests were consolidated for disposition, and after Sharifipour plead guilty to two counts of grand larceny in 2001, he was sentenced to consecutive periods of local imprisonment and probation.  While on probation, he

---

[3]The forged instrument arrests relate to his possession of stolen checks that were subsequently cashed.

committed the 2004 offense, he subsequently pled guilty to possession of a forged instrument and grand larceny, and he was sentenced to three and one-half to seven years in state prison. *See Gov't Ex. 2*; *see also Sharifipour MOL* at 1-2, *Dkt. No. 16*. The current indictment charges mail thefts that occurred in 2003 before his January 2004 arrest.

In August 2003, Scavia and Smith were investigating the theft of checks from the mail, and the negotiation of those checks in the Rotterdam, New York area. They obtained copies of the stolen checks and learned that they had been processed through Sosan Sharifipour's account at Trustco Bank. Because of her husband's prior criminal record, he was a suspect. Both Scavia and Smith already knew Sharifipour, and wanted to talk to him.

At the time, Scavia was a thirteen year police veteran, and knew Sharifipour as a cook at Topps Diner. Scavia frequently ate there, and spoke with Sharifipour on numerous occasions. During those conversations, they always communicated in English. Sharifipour's responses were always appropriate, he never asked Scavia to repeat himself, and he never suggested by conversation or behavior that he lacked comprehension and communication skills. Scavia also knew about

4

Sharifipour's prior criminal record.

So too, Smith knew Sharifipour.  They had previously spoken on at least eight occasions, and Smith had actually participated in two of Sharifipour's prior check theft arrests.  During those arrests, Smith was present when Sharifipour was advised of his *Miranda* rights, waived them, and was questioned.  During every contact, Sharifipour spoke English, and Smith detected no difficulty in Sharifipour's comprehension or communication skills.

On August 27, Scavia called Sharifipour's residence.  He spoke with Sharifipour's wife, Sosan, and asked that she have her husband contact him.  Later, Sharifipour called, and he agreed to meet Scavia at the Rotterdam Police Station the following evening.

On August 28, Sharifipour voluntarily appeared at the station in the company of his two small children.  He, Scavia and Smith went to a well-lit, combination office and conference room on the second floor of the station used for interviews and meetings.  The conference portion of the room was approximately twelve feet square, and contained book shelves and a large conference table.  The three men sat around the conference table.  The children accompanied them to the second floor and remained seated

5

outside during the thirty to forty-five minutes that their father was interviewed.

At the outset and without first administering *Miranda* warnings, Scavia told Sharifipour that he was a suspect in a check theft and cashing investigation, and that he wanted to interview him.  Sharifipour consented to the interview, and then made oral statements.  *See Gov't Ex. 1 ("First Statement")*.  After the oral conversation, Scavia used a preprinted *Miranda* card to fully advise Sharifipour of his rights, and asked whether Sharifipour would waive his rights and provide a written statement.  Sharifipour said that he understood his rights, consented to waive them, and agreed to make a written statement.  Scavia then used a preprinted statement form to record Sharifipour's statement.

As Scavia asked Sharifipour clarifying questions based on the earlier oral statement, Scavia wrote the statement.  At the top, the form listed the *Miranda* warnings.  Scavia filled in pedigree information supplied by Sharifipour, and Sharifipour initialed the advise of rights paragraph.  Scavia then gave the statement to Sharifipour, and asked Sharifipour to read a portion out loud in order to satisfy himself that Sharifipour could read.  Sharifipour complied.  Sharifipour then read the entire statement during

6

which he, Smith and Scavia discussed some of the words because both Smith and Sharifipour had questions about Scavia's handwriting.  At the bottom of the statement, the form contained the following recitation: "I have read the above statement and swear that it is the truth to the best of my knowledge and recollection.  I can read and I understand what I read." Sharifipour initialed the statement above the recitation, and signed the statement below it.  In general, Sharifipour admitted that he had cashed the checks, but denied stealing them, instead stating that he bought them from an intermediary named "Wayne."

During the entirely cordial interview, Scavia and Smith made no threats or promises, they used no deception, and they employed no threatening language or techniques to induce Sharifipour to speak. Sharifipour was not subject to any restraints, including restrictions on his freedom of movement.  The conversation was entirely in English, and Sharifipour neither expressed nor demonstrated any difficulty in his comprehension or communication skills.  Although police intentions are not dispositive of a custodial inquiry, neither Smith nor Scavia intended to arrest Sharifipour at that time because the investigation was incomplete. Smith had not obtained Trustco surveillance tapes that would reveal who

cashed the checks, and he had not obtained affidavits of forgery from the rightful owners of the checks.  At the conclusion of the interview, Sharifipour and his children left of their own accord.

Almost three weeks later on September 16, Smith received a telephone call from Sosan Sharifipour who told him that Trustco had contacted her about two more stolen checks that had been processed through her account.  She told Smith that she believed her husband had negotiated the checks.  Smith told Sosan that he would stop by her apartment, and he did so.  Fardin Sharifipour was not home, and Smith waited for him in the parking lot.  When Sharifipour arrived, Smith approached him, told him about the additional checks, and asked if they could talk in his apartment.  Sharifipour agreed, and invited Smith inside.

The two sat at Sharifipour's dining room table, and Shaifipour's wife was in and out of the room during the sixty to ninety minute cordial conversation.  Smith showed Sharifipour copies of checks they had discussed at the Rotterdam Police Station, and asked about the new ones disclosed by Sosan Sharifipour.  He did not first advise Sharifipour of his *Miranda* rights.  Again, Sharifipour made incriminating oral admissions. Smith then told Sharifipour he wanted to reduce the admissions to a sworn

8

statement, but wanted to administer the *Miranda* warnings first.  Smith utilized a preprinted statement form to fully advise Sharifipour of his *Miranda* rights, following which Sharifipour waived them, and agreed to speak.  *See Gov't Ex. 3 ("Second Statement")*.  Sharifipour initialed the *Miranda* advice paragraph, and at Smith's request, wrote the date and time.  Smith then wrote Sharifipour's statement, and Sharifipour signed it.  Before signing it, Smith asked him to read the *Miranda* advice and several lines of the statement out loud which Sharifipour did.  Smith made the request in order to verify that Sharifipour could read.  The following recitation appeared at the bottom of the form above Sharifipour's signature: "I have read the foregoing statement made by me, consisting of "2" pages, and I have been given the opportunity to make corrections.  All the facts contained herein are true to the best of my knowledge and belief."  Again, Sharifipour admitted that he cashed the checks, but denied stealing them, instead claiming that he bought them from "Wayne".

During the interview, Smith made no threats or promises, he used no deception, and he employed no threatening language or techniques to induce Sharifipour to speak.  Sharifipour was not subject to any restraints, including restrictions on his freedom of movement.  The conversation was

9

entirely in English, and Sharifipour neither expressed nor demonstrated any difficulty in his comprehension or communication skills.  At the conclusion of the interview, Smith left.

After the September interview, Smith received additional information from Trustco about stolen and forged checks.  He retrieved copies of the checks, he obtained forgery affidavits from the victims, and he interviewed Michael McKeon, the owner of a gas station where the checks had been cashed.  He then contacted Sharifipour by telephone, and the two met on Friday, October 17, 2003, at the Brandywine Diner in Schenectady, New York.

While sitting in the Diner and without administering *Miranda* warnings, Smith showed Sharifipour the new checks, and told him that McKeon had identified Sharifipour as the person who cashed them.  Orally, Sharifipour denied any involvement with the checks or McKeon.  Smith then allowed Sharifipour to read a statement that McKeon had provided. Sharifipour read the statement, became agitated about its content, and told Smith that he wanted to cooperate and give Smith the real story.  However, Sharifipour wanted to first think about his cooperation over the weekend, and agreed to meet at Smith's office Monday morning.

10

On Monday morning, October 20, 2003, Sharifipour voluntarily appeared at Smith's office.  Lombardoni was also present because some of the stolen checks were United States Treasury checks over which Secret Service had primary investigative jurisdiction.  The three men went into an otherwise nondescript conference room where Smith laid out all of the stolen checks that had been negotiated at McKeon's gas station. Without the benefit of *Miranda* warnings, Sharifipour made incriminating admissions about them, and stated that he would answer questions.  At that point, Smith used a preprinted statement form, and read Sharifipour his complete *Miranda* rights.  He then had Sharifipour read the rights out loud, following which Sharifipour waived them and agreed to speak.  Smith then wrote Sharifipour's statement, following which Smith read it to Sharifipour, and Sharifipour initialed at least one correction and signed it. Again, the form contained the following recital at the bottom of the first page:  "I have read the foregoing statement made by me, consisting of "5" pages, and I have been given the opportunity to make corrections.  All the facts contained herein are true to the best of my knowledge and belief." *See Gov't Exs. 4-5 ("Third Statement")*.

The interview was cordial and lasted approximately two hours.

11

During the interview, Smith and Lombardoni made no threats or promises, they used no deception, and they used no threatening language or techniques to induce Sharifipour to speak.  Sharifipour was not subject to any restraints, including restrictions on his freedom of movement.  The conversation was entirely in English, and Sharifipour neither expressed nor demonstrated any difficulty in his comprehension or communication skills. At the conclusion of the interview, Sharifipour left.

Sharifipour intermittently worked for Espisito from 1991 through 2003.  He always communicated in English with her and his co-employees, and needed no interpreter.  From time to time, he read the newspaper and asked her to explain what something meant.  In her opinion, Sharifipour had difficulty reading cursive handwriting, but he could read the newspaper.  She had no opinion as to whether he could read the First Statement.  Sosan Sharifipour testified that her husband could not read and was uncomfortable in his ability to communicate in English.

Sharifipour did not testify at the hearing, but did submit a Declaration in support of his motion.  *See Sharifipour Dec.*, *Dkt. 16*.  He claims:  he cannot read or write English; he did not read any of his statements nor did the officers read them to him; he cannot effectively communicate in English

12

without the benefit of an interpreter; he was not advised of his *Miranda* rights at any time; and the police promised him that he would not be charged with a crime. *Id. at ¶¶ 8, 10-14.* Sharifipour swore to these assertions under penalty of perjury. *Id. at 3.*

Having resolved credibility issues, the court concludes that Sharifipour proficiently speaks and understands English. Not only does the court credit the testimony of Scavia, Smith, Lombardoni and Espisito to this effect, but it also relies on its own observations. Sharifipour did not request an interpreter during the hearing, and the court watched frequent animated exchanges between he and counsel during the testimony of one or another of the witnesses. While his reading skill may be limited, it is proficient enough to have permitted him to read his *Miranda* rights and his statements, and to have made corrections and notations where appropriate. Accordingly, he can read English, he did read his statements, and he can effectively communicate in English without the benefit of an interpreter. Furthermore, he was advised of his *Miranda* rights on the occasions the court has recited, and the police never promised him that he would not be charged with a crime. Therefore, he lied in his Declaration. *See also United States v. Miller*, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y.

13

2005) ("[A] judge may consider a defendant's hearsay affidavit, but should 'give it such weight as his judgment and experience counsel.' Often, weight will be influenced by whether the affidavit is contradicted by more cogent evidence, especially that which withstands the scrutiny of cross-examination." (internal citation omitted)).  As for Sosan Sharifipour's testimony, the court is reminded of a comment by Judge Posner in an analogous context: "It is easy enough to produce an alibi witness, especially if one is blessed with many relatives."  *Thompkins v. Cohen*, 965 F.2d 330, 333 (7th Cir. 1992).

## III.  Discussion

### A.  The Statements

Sharifipour claims that his three statements must be suppressed because:  (1) each was induced by custodial interrogation without an intelligent and voluntary waiver of his *Miranda* rights; (2) each was involuntary within the meaning of the due process clause; and (3) the last two were tainted in succession by the unlawful statements preceding it. For the most part, Sharifipour's claims are governed by the legal principles recently articulated by this court in *United States v. McFarland*, --- F. Supp. 2d --- , 2006 WL 787785 (N.D.N.Y. Mar. 23, 2006).

14

All three written statements were preceded by non-*Mirandized* oral statements.  If *Miranda* warnings were required in the first instance, the court would be compelled to consider whether the subsequent warnings sufficiently apprized Sharifipour of his rights, whether he understood them, whether he waived them, and whether the written statements were tainted by the unwarned oral statements that preceded them.  *Id.* at *12, 18.  However, if Sharifipour was not subjected to custodial interrogation, that analysis is unnecessary because *Miranda* warnings were not required whatsoever.  *Id.* at *12.

*Miranda* applies only if two preconditions exist; namely, custody and interrogation.  *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)).  Absent either, non-*Mirandized* statements are admissible if not otherwise coerced under due process standards.  Interrogation requires express questioning or its functional equivalent, and includes questions seeking an incriminating reply.  *See McFarland*, 2006 WL 787785, at * 16-17.  Here, the police interrogated Sharifipour by asking incriminating questions.  Thus, the only issue is whether Sharifipour was in custody.

Custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that he or she was not

15

at liberty to terminate the interrogation and leave.  *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (citation omitted).  This "free to leave" test is the ultimate inquiry, it applies when the suspect was formerly at liberty, and it is defined as follows:

> The test ... is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses on the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

*United States v. Newton*, 369 F.3d 659, 669-70, 672 (2d Cir. 2004) (citation omitted).

When applying the test, the court must evaluate the totality of the circumstances, and assess a variety of relevant factors, although no factor alone is controlling.  They include:  the place of interrogation; the length of interrogation; whether the suspect voluntarily appeared; whether he was threatened with arrest or told he was free to leave; whether he was allowed to leave at the end of the questioning; and the existence of arrest-like restraints such as handcuffs, drawn weapons or other physical restrictions. *See Yarborough*, 541 U.S. at 661-68; *California v. Behler*, 463 U.S. 1121,

1125 (1983); *Oregon v. Mathiason*, 429 U.S. 492, (1977); *Newton*, 369 F.3d at 670, 675.

Because the test is an objective one, it does not focus on the suspect himself, but rather on how a reasonable person in the suspect's shoes would perceive his circumstances. *See Yarborough*, 541 U.S. at 662; *Newton*, 369 F.3d at 673 (citing *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)). Thus, subjective factors have no bearing on the custody inquiry. For this reason, a police officer's subjective view that an individual is a suspect is irrelevant. *See Stansbury v. California*, 511 U.S. 318, 320 (1994) (citations omitted). Naturally, if subjective beliefs are communicated to a suspect, they become objective facts. *Id.* Even then, however, the objective fact that someone is a suspect is not dispositive of the inquiry since suspects are often free to come and go. *Id.* While factors such as a suspect's age, education, intelligence, and prior experiences with law enforcement are relevant to the due process inquiry, those factors have no bearing on the custody determination. *Yarborough*, 541 U.S. at 667-68.

Whether statements comport with due process hinges on whether they were voluntary, *see McFarland*, 2006 WL 787785, at * 6-9; *see also*

17

*Dickerson v. United States*, 530 U.S. 428, 433 (2000), which the government must prove by a preponderance of the evidence.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1979).  Voluntariness focuses on "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession," *see Dickerson*, 530 U.S. at 434 (internal citation omitted), or stated differently, whether a statement is the "free and unconstrained choice of its maker."  *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988).  To make this determination, the court must assess the totality of the circumstances surrounding the interaction between the police and suspect, including the characteristics of the accused, the conditions of the interrogation, and the police conduct.  *See Dickerson*, 530 U.S. at 434; *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998).  No single factor controls the analysis.  Instead, each case rests on the combination of its unique facts, and an assessment of whether that combination results in a statement obtained in violation of a defendant's due process rights.  *Green*, 850 F.2d at 902.

Police conduct includes physical abuse, psychological coercion, threats, and material misrepresentations, or affirmative acts of trickery or deceit.  Although trickery and deception are relevant factors, the issue is

18

not whether the police used tricks or deceit.  Rather, it is whether tricks or

deceit undermined a suspect's ability to make a rationale choice about

confessing.  *See United States v. Gaines*, 295 F.3d 293, 299 (2d Cir.2002);

*United States v. Male Juvenile*, 121 F.3d 34, 41 (2d Cir. 1997); *United*

*States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995); *United States v.*

*Jaswal*, 47 F.3d 539, 542 ( 2d Cir. 1995) (*per curiam*).  Police statements

that are merely common sense factual observations are not material

misrepresentations based on improper promises.  *See United States v.*

*Ruggles*, 70 F.3d at 265.  The failure to disclose the details of an

investigation, or the fact that the suspect is a target does not constitute

affirmative deceit.  *See Colorado v Spring*, 479 U.S. 564, 575 (1987);

*Deshawn v. Safir*, 156 F.3d 340, 349 (2d Cir. 1998).  Deliberate lies in

response to a suspect's questions concerning the investigation or whether

he is a target are probative factors demonstrating involuntariness.  *See*

*Lynumn v. Illinois*, 372 U.S. 528, 534-35 (1963); *Spano v. New York*, 360

U.S. 315, 323 (1959); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir.

1992).

Characteristics of the accused include his experience, background,

age, education, intelligence, and physical and mental state.  Thus, a

19

suspect's inability to read or write is a relevant, but not controlling, factor. *See United States v. Gaines*, 295 F.3d 293, 296, 299 (2d Cir. 2002) (voluntariness of a *Miranda* waiver).  The critical issue is whether "[h]e heard the statement, knew what it meant, and freely agreed to it."  *Id.* at 296.  If a suspect's illiteracy emanates from a cognitive impairment, the impairment is itself a relevant factor.  *Id.* at 299.

Conditions of the interrogation include whether *Miranda* warnings were provided (as necessary or not), the place of interrogation, its duration and conditions, the attitude of the police when conducting the interrogation, and the presence of counsel.  *See Colorado v. Spring*, 479 U.S. at 574; *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997); *Green v. Scully*, 850 F.2d at 901.

Given the totality of the objective and credible circumstances, *Miranda* warnings were unnecessary at the time of Sharifipour's three statements because he was not in custody.  A reasonable person would have believed that he was free to terminate the interviews, and that he was free from arrest-like restraints.  Furthermore, the statements complied with due process because they were voluntary.

Before the first statement, Sharifipour was invited to the Rotterdam

Police Station by telephone, and he voluntarily appeared twenty-four hours later in the company of his two young children.  He, Scavia and Smith were not strangers since they had known one another for a long time.  The interview lasted only thirty to forty-five minutes, and the children remained outside the conference room where it occurred.  Although Sharifipour was told that he was a suspect, he was also told that he was there for an interview concerning stolen checks.  He was never threatened with arrest, and there was no evidence of arrest-like restraints.  The interview room itself was essentially a non-threatening and well-lit conference area.  The conversation was cordial, and there were no physical restraints of any kind, nor restrictions on Sharifipour's movements.  At the end of the interview, Sharifipour and his children went home.  Accordingly, he was not in custody.

The second interview occurred at Sharifipour's dining room table after he invited Smith into his apartment.  The sixty to ninety minute conversation was precipitated by information disclosed by Sharifipour's wife, and Smith told Sharifipour why he wanted to talk to him.  The conversation was cordial, and Sharifipour was not physically restrained in any way nor were his movements restricted.  Smith never threatened him

21

with arrest, nor said or did anything that would have conveyed arrest-like restraints.  At the conclusion of the interview, Smith left and Sharifipour remained at home.

The third interview was conducted at Smith's office, but was precipitated by Sharifipour who told Smith the preceding Friday while the two were sitting in a diner that he wanted to cooperate.  After taking the weekend to think about it, Sharifipour voluntarily appeared at the office on Monday morning.  Again, the two hour conversation was cordial, it occurred in an otherwise nondescript area of the office, and Sharifipour was not physically restrained in any way nor were his movements restricted.  Neither Smith nor Lombardoni ever threatened him with arrest, or said or did anything that would have conveyed arrest-like restraints.  At the conclusion of the interview, Sharifipour left.

Additional factors relate to the due process inquiry, and demonstrate that Sharifipour's three statements were voluntary.  Regarding his personal characteristics, he had intelligently participated in American society and the work force for almost twenty years.  Despite his lies to the contrary, he consistently communicated in English without the benefit of interpreters and he had at least limited reading skills.  The level of his reading acumen

22

aside, however, he suffered no cognitive mental impairment, and he was fully capable of understanding what the police said to him, and he was fully capable of communicating with them in English.  Furthermore, he was experienced in his prior contacts with the police, including contacts with Smith during prior arrests.  He was fully conversant with his *Miranda* rights as a result of his 2000 arrests, and had previously waived them and talked to the police.  There is no evidence, circumstantial or otherwise, that he suffered from any physical or mental impairment or lacked intelligence.

The court has already recited those factors relevant to the conditions of his questioning, but additional comment is pertinent to the due process inquiry.  While Scavia did not advise him of his *Miranda* rights before his first oral statement on August 28, he did so before the written statement. That advice was substantively complete, Sharifipour understood his rights, he waived them, and he consented to the written statement.  While the timing of the advice would not have passed constitutional muster if Sharifipour was in custody, the rights are nonetheless probative of the voluntary nature of the statement.  Furthermore, the *Miranda* warnings on August 28 are probative of the voluntariness of the statement on September 16, and the warnings on August 28 and September 16 are

23

probative of the voluntariness of the statement on October 20. So too, there is no evidence that Scavia, Smith or Lombardoni ever physically abused Sharifipour, threatened him, used psychological coercion, uttered any material misrepresentations or used trickery or deceit. Despite Sharifipour's suggestion to the contrary, they consistently told him he was a suspect and never told him that he would not be arrested. Accordingly, all three statements were voluntary.

Since *Miranda* warnings were not required before or during any of the three statements, it is unnecessary to decide whether Sharifipour voluntarily waived them. Since there is no *Miranda* violation and since all three statements were voluntary within the meaning of the due process clause, they are admissible. And, since all three statements pass *Miranda* and due process muster, it is unnecessary to decide whether the second and third are tainted. *See Miller*, 382 F. Supp. 2d at 374-75.

### B. Surplusage

In each of the indictment's eight counts, Sharifipour is alleged to have stolen one or more checks from the mail, and each count concludes with essentially the following statement: "... and cashed the checks and retained the proceeds from the checks." *See Indictment, Dkt. No. 11*.

24

Sharifipour seeks to strike this language, claiming it is immaterial, irrelevant, and prejudicial because it recites uncharged conduct.  *See Sharifipour MOL at 14, Dkt. No. 16*; *see also* FED. R. CR. P. 7(d).  The government concedes that the verbiage fails to address an element of the crime, but asserts that it constitutes admissible evidence of motive.  *See Gov't MOL at 13, Dkt. No. 18.*

Upon motion of a defendant, Rule 7(d) permits the court to strike surplusage from an indictment.  However, a motion to strike should be granted "only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)).  There are two distinct elements to the inquiry; namely, relevance and prejudice.  Thus, the degree of prejudice is generally of no moment if the allegation is relevant and admissible.  *Scarpa*, 913 F.2d at 1013.

Relevant evidence "means evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," FED. R. EVID. 401, and is generally admissible.  *Id.* at 402.

25

"Evidence of other crimes, wrongs, or acts ... may, however, be admissible

for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, [or] identity ...."  FED. R. EVID. 404(b).

Furthermore, evidence of uncharged crimes may be admissible if it arises

out of the same transaction or series of transactions as the charged

offense, or if it is inextricably interwoven with the charged offense, or if it is

necessary to complete the story of the charged offense.  *See United States*

*v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (citing, *inter alia*, *United*

*States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)).

In its simplest form, 18 U.S.C. § 1708 requires that the government

prove three essential elements: (1) that Sharifipour stole the checks listed

in each count of the indictment; (2) that he stole the checks when they

were under the control of the United States Postal Service; and (3) that he

knowingly and willfully took the checks with the intent to steal them.  *See* 2

L. Sand *et. al.*, *Modern Federal Jury Instructions*, at 49-21 (Instruction 49-

10) (2005).  Although an evidentiary ruling is better made at trial when a

foundation has been established and relevance is easiest to discern, the

court has no difficulty at this juncture with the determination that the

disputed allegation is admissible.  Sharifipour may be correct that cashing

the checks and retaining the proceeds is a separate crime, but that assertion is not dispositive.  At least in part, Scavia and Smith focused on Sharifipour as a suspect precisely because he cashed the checks and retained the proceeds.  When they retrieved some of the stolen checks, they were endorsed and cashed by Sharifipour and some were processed through his wife's account at Trustco.  At trial, such relevant evidence may be admissible as proof of motive, opportunity, preparation, plan, knowledge, and Sharifipour's identity as the thief.  It is also likely that such evidence arises out of thefts alleged in the indictment, that it is inextricably interwoven with those multiple thefts, and that it may be necessary to complete the story of the alleged events.  Accordingly, Sharifipour's motion to strike is denied.

## IV.  Conclusion

For the reasons stated herein, it is hereby

**ORDERED** that the motion of Fardin Sharifipour to suppress statements dated August 28, September 16, and October 20, 2003, is **DENIED**, and it is further

**ORDERED** that the motion of Fardin Sharifipour to strike surplusage from the indictment is **DENIED**.

27

**SO ORDERED.**

Gary L. Sharpe
U.S. District Judge

Date:   April 17, 2006
        Albany, NY